U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 JAN 19 PM 2:50

CLERK
BY _____PM_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA )
)
v. ) Case No. 11-cr-50
)
RONALD WILLIE NEWTON )

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS STATEMENTS
(Doc. 30)

This matter comes before the court on Defendant Ronald Willie Newton's Motion to Suppress Statements (Doc. 30). Defendant argues that because he did not voluntarily waive his *Miranda* rights, and because law enforcement agents failed to stop questioning him after he invoked his right to counsel, his statements were obtained in violation of his constitutional rights. The Government opposes the motion. The parties waived oral argument.

The Government is represented by AUSA Timothy C. Doherty, Jr. Defendant is represented by Natasha Sen, Esq.

**I.    Factual Background.**

Defendant is charged in five counts of a fourteen count Indictment with conspiracy to distribute cocaine; cocaine possession with intent to distribute; possession of a firearm in furtherance of a drug trafficking crime; possession of a firearm as a convicted felon; and a final count of aiding another to knowingly make a false written statement in order to procure a firearm for Defendant. Also charged in the Indictment are co-defendants, Terry Bahner, Lestly Westcott, and Bethany Pastuszak.

On May 14, 2011, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") executed a search warrant at the residence of Terry Bahner on 9 Averill Street in Barre, Vermont. Before executing the warrant, ATF learned that Mr. Bahner's alleged cocaine source, a man from Philadelphia, was staying at his residence. During the search, ATF agents found Defendant in bed in an upstairs bedroom. In the same bedroom, they

discovered cocaine and a loaded .40 caliber semi-automatic handgun in a dresser drawer. ATF agents detained Defendant and brought him to the Barre Police Department where he was formally placed under arrest.

That same day, at the Barre police station, ATF Special Agent ("SA") Matthew Ekstrom and ATF Resident Agent in Charge ("RAC") James Mostyn conducted a recorded interview of Defendant in an interview room.[1] The interview lasted approximately fifty minutes. Defendant was seated on one side of the table in the room, and the agents were seated next to each other on the opposite side. Defendant was seated close to a door which was closed. The agents were not in uniform and did not appear to be armed. Defendant was not handcuffed, shackled, or otherwise restrained throughout the interview. Both agents consistently addressed him in an even tone and polite manner. Only one of the agents questioned Defendant for most of the interview. The agents did not physically touch or threaten Defendant. There is no allegation that the agents engaged in either deception or trickery.

Neither party has presented any evidence of Defendant's age, education, or intelligence. The Government contends that Defendant is a convicted felon, and his record includes a 2010 Pennsylvania state court conviction for criminal conspiracy to commit murder and a 2010 Pennsylvania state court conviction for aggravated assault. The Government further contends that, at the time of his arrest, Defendant was on probation.

At the commencement of the May 14, 2011 interview, SA Ekstrom explained to Defendant that he and RAC Mostyn were ATF agents, and that Defendant was under arrest. SA Ekstrom also explained that ATF had a search warrant for Terry Bahner's residence that morning, as well as arrest warrants for Mr. Bahner and his step-father, Lestly Westcott. SA Ekstrom showed Defendant an Advice of Rights and Waiver form, told Defendant what the form was, and asked him to read along so that he would

---

[1] The court has reviewed the video of the agents' May 14, 2011 interview of Defendant.

understand his rights. Before SA Ekstrom began to read the rights listed on the form, Defendant stated:

> I understand my rights, I mean, I'm not signing no papers. I had a bad experience with signing papers and law enforcement doing what they want with it, so I'm not signing no papers unless I have a lawyer present. No offense, I understand you all are doing your job to the fullest, I'm just not signing no papers.

Defendant said he "had no problem" with the agents reading the waiver form aloud to him, and SA Ekstrom proceeded to read the form verbatim.[2] After he finished reading the form to Defendant, SA Ekstrom again explained that he was not just reading something off a form, but instead he was "serious about" Defendant's right not to speak with the agents and to have an attorney present. The following exchange then ensued:

> **RAC Mostyn**: Before we continue, do you understand this (gesturing to the waiver of rights form)?
>
> **Defendant**: Yeah, I understand it.
>
> **RAC Mostyn**: So you are willing to continue talking to us and listening to us?
>
> **Defendant**: Yeah, definitely.
>
> **RAC Mostyn**: And you know you can stop, start and stop talking to us whenever you want to?
>
> **Defendant**: Yes.
>
> **RAC Mostyn**: Okay.
>
> **SA Ekstrom**: I'm just going to sign it (the waiver of rights form) as . . .
>
> **RAC Mostyn**: Refuse. And (indicating on waiver of rights form) just refuse.

---

[2] SA Ekstrom advised Defendant: "You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you, if you wish, before any questioning begins. If you decide to answer any questions without a lawyer present, you have a right to stop answering at any time." SA Ekstrom then read Defendant the waiver portion of the form: "I have read this statement of my rights or it has been read to me, and I understand these rights. At this time, I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me."

3

In addition to agreeing that he was "definitely" willing to continue the interview, Defendant was given repeated opportunities to stop the questioning. Defendant later stated that he did not "have a problem talking about anything because [he] did nothing."

After reminding Defendant at least a third time that he did not need to answer any questions, the ATF agents told Defendant the agents wanted his side of the story, including why he came to Vermont and his relationship with his co-defendants. The agents repeatedly told Defendant he could tell them what happened "in his own words." In fact, SA Ekstrom said "I don't want to put my words in your mouth." He advised that often in federal investigations others are cooperating, and one of the defendants is "left holding the bag." He told Defendant that he "didn't have to say a word" or "offer any explanation," and that was "certainly his right," but the agents would inform the prosecutor and the judge who was cooperating in the investigation. In response to SA Ekstrom's prompting, Defendant told the agents his reasons for leaving Philadelphia, including his involvement in a Philadelphia murder investigation.

In the course of their questioning, ATF agents told Defendant that they had evidence against him stemming from undercover buys and informants, and they had a video of him and Ms. Pastuszak[3] from outside the firearms store. They repeatedly emphasized that their investigation was well underway, and that they did not need Defendant's statements. After initially denying any involvement in the crimes under investigation, Defendant admitted he obtained the firearm in order to provide protection for the Barre house but denied having any intention of harming anyone or supporting a new drug operation in Barre. After initially denying the cocaine was his, Defendant admitted that the loaded handgun and cocaine found in the bedroom at 9 Averill Street in Barre belonged to him.

---

[3] Ms. Pastuszak was charged with making false written statements to procure the aforementioned firearm in violation of 18 U.S.C. § 922(a)(6).

At the end of the interview, the agents asked Defendant if they had treated him well and whether they had made any promises to him, intimidated him, or mistreated him in any manner. Defendant did not respond other than to shrug.

## II. Legal Analysis and Conclusions.

Defendant seeks suppression of all statements he made during the May 14, 2011 interview on the grounds that he did not voluntarily waive his *Miranda* rights. Defendant seeks suppression on the further grounds that he invoked his right to counsel and was nonetheless subjected to custodial interrogation thereafter. The Government opposes suppression, contending Defendant voluntarily waived his *Miranda* rights and did not unequivocally invoke his right to counsel.

### A. Whether Defendant Voluntarily Waived his *Miranda* Rights.

The parties agree that Defendant was subjected to custodial interrogation on May 14, 2011. They also agree that ATF agents adequately advised Defendant of his *Miranda* rights. The only issue is whether Defendant's willingness to speak thereafter constituted a voluntary relinquishment of his *Miranda* rights.

The government bears the burden of proving a waiver of *Miranda* rights by a preponderance of the evidence. *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991); *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). To be voluntary, a waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The "inquiry into the . . . voluntariness of a waiver is 'directed to a defendant's state of mind, which can be inferred from his actions and statements.'" *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177, 211 (2d Cir. 2008) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993)).

Although the better practice is to obtain a written waiver of *Miranda* rights, a written waiver is neither dispositive of whether a waiver is voluntary,[4] nor does the

---

[4] *See United States v. Spencer*, 955 F.2d 814, 819 (2d Cir. 1992) ("defendant's refusal to sign a waiver form is not dispositive" of the issue of whether defendant's waiver is knowing and voluntary).

absence of a written waiver negate the possibility of a valid oral waiver.[5] *See United States v. Gaines*, 295 F.3d 293, 297 (2d Cir. 2002) (recognizing there is "no *per se* rule that bars oral or implicit waivers" of *Miranda* rights). To determine the validity of a *Miranda* waiver, the court must consider the totality of circumstances, "including the background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979); *see In re Terrorist Bombings*, 552 F.3d at 213 (quoting *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003)) (instructing the court to consider "(1) the accused's characteristics, (2) the conditions of the interrogation, and (3) the conduct of the police.").

Here, it undisputed that Defendant refused to sign a written waiver of his *Miranda* rights without an attorney present and never explicitly orally agreed to waive his rights. Thereafter, Defendant, whose age, intelligence, and education are all unknown,[6] was questioned by two ATF agents in a police station after being told he was under arrest. The ATF agents repeatedly confronted Defendant with evidence of his guilt and advised him that evidence of his cooperation would be presented to the prosecutor and the judge. *See United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("An indication by arresting

---

[5] *See United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir. 1974) (holding "a written waiver is not required," although "refusal to execute a written waiver may be taken as an indication that no waiver was intended or freely given."); *United States v. Thompson*, 417 F.2d 196, 197 (4th Cir. 1969) (holding defendant's "refusal to sign a written waiver did not render the confession inadmissible" after a valid oral waiver); *United States v. Gell-Iren*, 146 F.3d 827, 830 (10th Cir. 1998) (upholding the validity of an oral waiver and stating "[w]here a defendant's actions clearly demonstrate that he has voluntarily waived his *Miranda* rights, his failure to sign a waiver of rights form does not render his waiver involuntary.").

[6] As noted, the Government has failed to adduce any evidence of Defendant's age, education, or intelligence. This failure of proof does not, without more, warrant suppression. *See United States v. Morales*, 2011 WL 797330, at *6 (N.D. Iowa Feb. 14, 2011) (denying defendant's motion to suppress despite lack of evidence as to defendant's education or intelligence); *United States v. Horton*, 490 F. Supp. 2d 1161, 1169 (D. Kan. 2007) (deciding defendant's waiver was voluntary despite having no evidence in the record as to whether defendant's intelligence or education limited his ability to voluntarily make a statement). However, these facts should be construed against the Government. *See State v. Mumley*, 2009 VT 48, ¶ 26, 186 Vt. 52, 62, 978 A.2d 6, 13 (reversing denial of motion to suppress where prosecution failed to provide information about defendant's experience, education, background, and intelligence).

officers to the defendant that his cooperation will help him is only one factor to consider in determining whether the defendant's waiver was given voluntarily."). These facts and circumstances suggest *some* evidence that Defendant's statements may not have been wholly voluntary. *See Miranda*, 384 U.S. at 467 (finding that when a person is subjected to custodial interrogation, there are "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.").

On the other hand, numerous and more compelling facts and circumstances support a contrary conclusion. First, ATF agents clearly advised Defendant of his *Miranda* rights, and he agreed that he understood them and assured them that he had no objection to answering their questions. Thereafter, the agents repeatedly reminded Defendant that he did not need to speak to them, and Defendant assured them that he was willing to do so. *See Earl v. Fabian*, 2011 WL 2457924, at *11 (D. Minn. Feb. 25, 2011) (agents' repeated *Miranda* warnings coupled with numerous inquiries regarding whether suspect wished to speak without an attorney supported finding that *Miranda* rights were voluntarily waived).

Second, after receiving *Miranda* warnings, Defendant not only answered the agents' questions without apparent hesitation but provided information about a murder investigation of which he was the subject. This is strong evidence of voluntariness. *See Robles v. Gov't of Virgin Is.*, 2008 WL 5632269, at *3 (D. Virgin Is. Feb. 27, 2008) ("An explicit waiver is not necessary to show that a defendant has waived his right to remain silent when he or she volunteers incriminating statements."); *United States v. Stanley*, 2009 WL 2105676, at *6 (D. Neb. July 13, 2009) (denying motion to suppress and finding "defendant willingly, almost eagerly, talked with the officers"); *United States v. Corleto*, 2009 WL 274488, at *5 (D. Utah Feb. 5, 2009) (concluding defendant's "willingness to answer questions after being advised of his rights shows a clear waiver of his Fifth Amendment rights.").

Third, although Defendant informed the officers that he did not have any experience with the federal system, Defendant had two state felony convictions, was on

7

probation, and referenced a prior "bad experience" with law enforcement using papers he had signed. Defendant was thus not a neophyte confronted with an unfamiliar criminal justice system. *See Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988) (finding defendant's confession voluntary and noting he had "some familiarity with the criminal justice system by virtue of having been arrested on two previous occasions and questioned once"); *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (recognizing defendant's familiarity with police questioning and his *Miranda* rights, such that "there is no indication in this record that [defendant] was a newcomer to the law," when determining defendant knowingly and voluntarily waived his *Miranda* rights) (quoting *United States v. Watson*, 423 U.S. 411, 424-25 (1976)).

   Fourth, the ATF agents did not threaten or coerce Defendant and maintained an even and polite tone of voice throughout the questioning. The agents wore street clothes, did not appear to be carrying weapons, and remained seated during the interview. They never touched Defendant, and he was not shackled or otherwise physically restrained. These facts support a conclusion that Defendant was not subjected to any pressure beyond that which is inherent in custodial interrogation. *See United States v. Castro-Higuero*, 473 F.3d 880, 886-87 (8th Cir. 2007) (finding a valid *Miranda* waiver after considering, among other factors, that agent was unarmed and in street clothes); *see also Green*, 850 F.2d at 903 (noting "[t]here is no suggestion of physical mistreatment by the detectives."); *Reck v. Pate*, 367 U.S. 433, 440 (1961) ("Physical mistreatment is but one such circumstance [to consider when determining if a confession is voluntary], albeit a circumstance which by itself weighs heavily.").

   Fifth, although ATF agents advised Defendant of the potential benefits of cooperation, they did not suggest to Defendant that he could avoid prosecution by answering their questions. *See United States v. Bye*, 919 F.2d 6, 10 (2d Cir. 1990) (rejecting contention that AUSA's statement regarding purported benefits of cooperating necessarily "converts an otherwise proper encounter between the police and the accused into a coercive and overbearing experience."); *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) (stating "a confession is not involuntary merely because the suspect was

8

promised leniency if he cooperated with law enforcement officials."); *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989) (holding law enforcement officers are "free to discuss with [a defendant] the evidence against him and the reasons why he should cooperate."); *United States v. Pomares*, 499 F.2d 1220, 1221 (2d Cir. 1974) (finding law enforcement properly told defendant that he faced "heavy penalties" and "that the wisest course of action would be to cooperate with the government.").

    Finally, in the face of the agents' questioning, Defendant maintained the firearm was intended only for home protection and not for use in a drug distribution business or for intimidation, thus evidencing his retention of his free will. *See United States v. Vilar*, 141 F.3d 1152, 1998 WL 105771, at *1-2 (2d Cir. Mar. 9, 1998) (finding accused's will was not overcome because he refused to admit that he shot a police officer despite making other incriminating statements); *United States v. Wilbon*, 309 F. App'x 27, 30 (7th Cir. 2009) (noting that the accused "show[ed] independent thinking and free will" because he "refused to provide a written statement during the interrogation and denied his involvement in other robberies"); *United States v. Willis*, 2006 WL 2239738, at *6 (W.D.N.Y. Aug. 4, 2006) ("Indeed, the fact that [defendant] refused to sign the *Miranda* waiver form when requested by [the officer] is persuasive evidence that the interrogation was not so psychologically coercive that [defendant's] free will was overborne.").

    Collectively, the evidence overwhelmingly supports a conclusion that Defendant's will was never overborne and that, after receiving and understanding his *Miranda* rights, he voluntarily answered the ATF agents' questions. Based upon the totality of the evidence, the court thus concludes that the Government has established by a preponderance of the evidence that Defendant voluntarily and validly waived his *Miranda* rights by answering the ATF agents' questions after receiving adequate and repeated advisement of those rights. *See United States v. Cardwell*, 433 F.3d 378, 389-90 (4th Cir. 2005) (finding "as clear an indicia of [defendant's] implied waiver of his right to remain silent as [the court could] imagine" where defendant willingly answered questions after being fully informed of his *Miranda* rights). Defendant's motion to suppress on the basis of an involuntary *Miranda* waiver is therefore DENIED.

### B. Whether Defendant Unequivocally Invoked his Right to Counsel.

Defendant seeks suppression on the alternative ground that he unequivocally invoked his right to counsel and was nonetheless questioned thereafter. The Government contends that Defendant's invocation of the right to counsel pertained only to his willingness to sign the waiver form and was not an insistence that counsel be present before or during questioning.

"[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States*, 512 U.S. 452, 461 (1994); *see Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (concluding that if a suspect requests counsel during an interview, he is not to be subjected to further questioning until a lawyer has been made available or the suspect reinitiates conversation); *Wood v. Ercole*, 644 F.3d 83, 90 (2d Cir. 2011) ("Binding precedent is clear: once a suspect requests counsel, all interrogation must stop until an attorney is provided or the suspects reinitiates conversation.").

Not all references to an attorney, however, are sufficient to constitute an invocation of counsel. A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459 (creating an objective standard); *Ercole*, 644 F.3d at 90, 92 (concluding defendant's statement "I think I should get a lawyer" was unequivocally a request for legal representation, reflected "no internal debate whatsoever," and meant agents had an obligation to stop all questioning).

"If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning." *Davis*, 512 U.S. at 461-62. Moreover, although "it will often be good police practice for the interviewing officers to clarify whether or not [the defendant] actually wants an attorney," *Davis*, 512 U.S. at 461, the Supreme Court has nevertheless "decline[d] to adopt a rule requiring officers to ask clarifying questions." *Id.*[7]

---

[7] *See also Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994) (recognizing the holding of *Davis* as negating officers' duty to clarify a suspect's intent upon an equivocal invocation of

10

In this case, Defendant clearly stated that he wished to have an attorney present before he signed the *Miranda* waiver form. He explained that he had a prior bad experience with law enforcement using papers he had signed. Although he was adamant that he would not sign a written *Miranda* waiver without an attorney present, he was equally adamant that this did not mean he was unwilling to answer the ATF agents' questions. Indeed, nothing Defendant said or did reflected any intent, request, or expectation that legal counsel would be made available to him prior to or during questioning. Rather, after Defendant revealed that he knew how to invoke his right to counsel, he did so for the limited purpose of ensuring that he did not sign anything without consulting an attorney first. An invocation of counsel for a limited purpose is valid and does not automatically extend to questioning that occurs thereafter. *See Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) (concluding defendant clearly stated his intent to give an oral statement although he was not willing to give a written statement without the presence of counsel, and ruling "[i]nterpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous"); *United States v. Mikelic,* 2011 WL 4368565, at *11 (D. Conn. Sept. 19, 2011) (finding no violation of defendant's Fifth Amendment right to counsel where defendant stated that he wanted to speak with his lawyer only with respect to certain questions, but not others).

Here, Defendant's invocation of counsel was for the limited purpose of signing the *Miranda* waiver form. The ATF agents did not attempt to gain Defendant's signature on the form in the face of that request. However, in contrast, nothing Defendant said or did could be construed to constitute an unequivocal request to have counsel present before or during questioning. In such circumstances, ATF agents were free to continue to question him and did so without violating Defendant's constitutional rights. Defendant's motion

---

counsel); *United States v. Muhammad*, 120 F.3d 688, 698 (7th Cir. 1997) ("During an interrogation . . . an officer has no obligation to clarify the ambiguous statement [requesting counsel] by the accused."); *United States v. Scurlock*, 52 F.3d 531, 537 (5th Cir. 1995) (opining "the investigator conducting the questioning has no obligation to attempt to clarify the ambiguous comment [requesting counsel] of the accused.").

11

to suppress on the basis of an alleged violation of his right to counsel must therefore be DENIED.

## CONCLUSION

For the reasons stated above, the court hereby DENIES Defendant's motion to suppress statements. (Doc. 30.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 19th day of January, 2012.

Christina Reiss, Chief Judge
United States District Court